J-S32024-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JUAN MEDINA | |
| Appellant | No. 1559 EDA 2016 |

Appeal from the Judgment of Sentence June 13, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0009759-2011

BEFORE:  GANTMAN, P.J., STABILE, and FITZGERALD, [*] JJ.

MEMORANDUM BY STABILE, J.:                              **FILED JULY 17, 2017**

Appellant, Juan Medina, appeals from the June 13, 2012 judgment of sentence entered in the Court of Common Pleas of Philadelphia County ("trial court") sentencing him to a term of 7-14 years' incarceration following his conviction for possession with intent to deliver a controlled substance (PWID).[1]  Upon review, we affirm.

Briefly, on June 13, 2012, Appellant was convicted of PWID following a jury trial.  Following multiple reinstatements of his direct appellate rights, Appellant filed the instant appeal.  The trial court summarized the factual history of the matter as follows.

---

[*] Former Justice specially assigned to the Superior Court.
[1] 35 P.S. § 780-113(a)(30).

At trial, the Commonwealth first presented the testimony of Philadelphia Police Officer Brian Myers. Officer Myers testified that, on March 30, 2011, at approximately 5:40 p.m., he was on duty with the Narcotics Field Unit, which is responsible for investigating illegal sales of narcotics. On this particular date, he and his surveillance team were on assignment in the target area of North 5th Street and Hunting Park Avenue, specifically to investigate street sales of narcotics. From a discreet position at the northeast corner of the above intersection, Officer Myers observed a Hispanic male wearing a green jacket and blue jeans standing on the corner and looking in all directions. A few moments later, Appellant, who was wearing a red hat and brown jacket emerged from a corner store located one half-black away on the southeast corner of Fairhill Street and Hunting Park Avenue. Appellant walked eastbound to 5th Street, where he met up with the other male and engaged in a brief conversation. Appellant then walked back to the corner store on Fairhill Street with his right hand in his jacket pocket the entire time. At that point, Officer Myers radioed a description of Appellant to his backup officers and instructed them to stop Appellant for investigation. (**See** N.T. 06/12/12, pp. 14-20).

Philadelphia Police Sergeant Robert Friel testified next for the Commonwealth. Sergeant Friel testified that, on March 30, 2011, he was on duty with the Narcotics Field Unit, serving as a back-up officer to Officer Myers. Sergeant Friel observed Appellant walking westbound on Hunting Park Avenue, between 5th and Fairhill Streets, before he entered a store on the corner of Fairhill Street and Hunting Park Avenue. Upon receiving information from Officer Myers, Sergeant Friel and his partner, Officer Coolen, entered the corner store, where they encountered Appellant sitting at a table toward the back of the store. Sergeant Friel and Officer Coolen approached Appellant and announced "Police", at which time Sergeant Friel observed Appellant retrieve a clear plastic bag from his right jacket pocket, and discard it onto the floor beneath the table. As Officer Coolen tried to get Appellant to stand up, Sergeant Friel immediately went under the table and retrieved the bag. He testified that, "At that point, [Appellant] started to fight us." Upon detaining Appellant in handcuffs, Sergeant Friel placed the bag, which contained a tan substance suspected to be heroin, under property receipt, and submitted it to the chemistry lab for further analysis. (**See** N.T. 06/12/12, pp. 36-47).

The Commonwealth also presented the testimony of Philadelphia Police Officer Antonio Morrone, who testified as an expert in the field of packaging and distribution of narcotics. Officer Morrone testified that he examined the heroin recovered by police, and that based on its size (173 grams) – in addition to its purer color (tan) and consistency (grounded and moist) – the heroin was possessed with an intent to deliver. Officer Morrone explained that, beside never personally encountering a single, personal purchase of this size, a user never would purchase 173 grams of heroin because it would be too expensive (it would cost between $8,500 and $13,000) and lose its purity over time (more rapidly depending on exposure to light and air). He further explained that a heavy user ingests 100 to 130 milligrams per day, and therefore the 173 grams of heroin recovered in this case would last a user 12 to 17 months. Moreover, in his experience, users typically purchase only a couple small packets at a time, not 737 [(sic)] grams. In fact, the only people he had encountered with such an amount were at a higher level in the drug distribution chain – *i.e.*, "not a regular street dealer, it would be somebody in the higher chain of the distribution of heroin." (**See** N.T. 06/12/13, [(sic)], pp. 4-20).

> [FN2] Both Sergeant Friel and Officer Coolen were in plain clothes, with their police badges exposed. (**See** N.T. 06/12/12, pp. 37-38, 49-50).

> [FN3] The Commonwealth introduced via stipulation chemical analysis evidence establishing that the item recovered by police – one clear bag containing a tan powder – tested positive for heroin and weight 173.7 grams. (**See** N.T. 06/12/13 [(sic)], p.24).

> [FN4] At the time of trial, Officer Morrone had spent 28 years with the Philadelphia Police Department, 25 of which were in the Narcotics Field Unit. In addition to undergoing narcotics training with the New York, New Jersey and Pennsylvania state police, he spent five years working, and undergoing extensive narcotics training, with the Federal Drug Enforcement Agency (DEA), including training on the manufacturing of narcotics from plant source to final packaged product. Over the course of his career, Officer Morrone personally had participated in more

than 800 drug arrests.   (***See*** N.T. 06/12/13 [(sic)],
pp. 4-15).

Trial Court Opinion, 8/17/16, at 2-3 (quoting Trial Court Opinion, 3/13/13).

Appellant raises four issues on appeal, which we repeat verbatim.

I.      Whetther [(sic)] the trial court abused its discretion by
        improperly admitting Officer Morrone's testimony as to his
        personal opinion?

II.     Whether there was sufficient evidence to sustain a
        conviction without evidence of the delivery or transport of
        the drugs in question?

III.    Whether there was sufficient evidence to sustain a
        conviction without the fact that Appellant possessed the
        drugs in question being proven beyond a reasonable
        doubt?

IV.     Whether the [trial] court abused its discretion in denying
        Appellant's objection to closing argument of prosecutor
        based on prosecutorial misconduct[?]

Appellant's Brief at 9.

Appellant's first challenge is to the trial court's admission of Officer

Morrone's testimony regarding his opinion about the use of the quantity of

drugs found at the scene.   Officer Morrone was qualified as an expert

witness in the field of packaging and distribution of narcotics.   Appellant is

challenging the following testimony by Officer Marrone.

> It's my personal opinion, I have never seen one purchase this
> large amount, because mostly users that I know, and have
> spoken to several thousands of them, and distributors and
> dealers, would not have this amount.   They would just buy a
> couple of bags, a bundle per day.   Having this much finger tips,
> my personal opinion, they would abuse it.

N.T. Jury Trial, 6/13/12 at 14. The Pennsylvania Rules of Evidence provide for opinion testimony by expert witnesses. Pa.R.E. 702. "Our standard of review in cases involving the admission of expert testimony is broad: 'Generally speaking, the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion.'" *Commonwealth v. Watson*, 945 A.2d 174, 176 (Pa. Super. 2008) (quoting *Commonwealth v. Brown*, 596 A.2d 840, 842 (Pa. Super. 1991), *appeal denied*, 616 A.2d 982 (Pa. 1992) (additional citation omitted)).

Upon review of the record, Appellant failed to object to this testimony, thus Appellant failed to preserve the issue for appeal and the issue is waived. *See Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1288 (Pa. Super. 2004) ("It is well established that absent a contemporaneous objection [to an evidentiary issue,] the issue is not properly preserved on appeal") (citations omitted). Even if the issue was not waived, we find that the trial court did not abuse its discretion in admitting the testimony of Officer Morrone as he was qualified as an expert in the field of packaging and distributing narcotics. Moreover, the trial court's August 17, 2016 opinion adequately addresses the issue. *See* Trial Court Opinion, 8/17/16, at 5-10. Thus, Appellant's claim fails.

Appellant's next two issues are challenges to the sufficiency of the evidence, namely, whether there was evidence of a delivery or transfer of

the drugs in question and whether Appellant possessed the drugs in question.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weight the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Roberts*, 133 A.3d 759, 767 (Pa. Super. 2016) (quoting *Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa. Super. 2010) (citations omitted)). "To sustain a conviction for PWID, 'the Commonwealth must prove both the possession of the controlled substance and the intent to deliver the controlled substance.'" *Id.*, (quoting *Commonwealth v. Lee*, 956 A.2d 1024, 1028 (Pa. Super. 2008)). Upon review, the trial court's August 17, 2016 opinion adequately addresses these issues. *See* Trial Court Opinion, 8/17/16, at 10-12. When the officers announced their presence, Appellant retrieved the bag of heroin from his jacket pocket and threw it on the floor. Thus, the Commonwealth established possession. Moreover, the

quantity of drugs, the packaging, the condition, and the circumstances of the arrest, established that Appellant intended to deliver the controlled substance. Thus, Appellant's claims fails.

Appellant's final claim is that the trial court abused its discretion when it overruled Appellant's objection, based upon prosecutorial misconduct, to the Commonwealth's closing argument. Specifically, Appellant challenges the prosecution's comments "Should we have turned [Appellant], should we have gone up the chain, try to figure out who this next connection was? Maybe. There is only one person in the room who knows whose [Appellant's] next connection was, that's [Appellant.]" N.T. Jury Trial 6/13/12, at 19-20. Upon review of the record, the trial court adequately addressed this issue in its August 17, 2016 opinion. *See* Trial Court Opinion, 8/17/16, at 13-16. Thus, we find that the trial court did not abuse its discretion in overruling Appellant's objection.

In conclusion, we find that Appellant's claims are waived, or meritless. Therefore, we affirm the judgment of sentence. We direct that a copy of the trial court's August 17, 2016 opinion be attached to any future filings in this case.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/17/2017</u>

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   :   CP-51-CR-0009759-2011

     VS.         :

JUAN MEDINA        :   1559 EDA 2016

**FILED**

AUG 17 2016

Criminal Appeals Unit
First Judicial District of PA

OPINION

SCHULMAN, S.I., J.

  Juan Medina ("Appellant") appeals his conviction and sentence, and this Court submits the following Opinion pursuant to Pa. R.A.P. No. 1925, recommending that Appellant's appeal be denied.

**PROCEDURAL HISTORY**

  On June 13, 2012, a jury convicted Appellant of Possession with Intent to Deliver a Controlled Substances ("PWID"),[1] following which this Court sentenced him to a mandatory minimum term of seven (7) to fourteen (14) years' incarceration. On September 11, 2012, Appellant filed a petition under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 et seq., seeking nunc pro tunc reinstatement of his direct appeal rights, which this Court granted on September 28, 2012. Appellant thereafter filed a direct appeal, but before its disposition the appeal was "discontinued" on July 3, 2013. See Commonwealth v. Medina, 2909 EDA 2012.[2]

  On December 13, 2013, Appellant filed a *pro se* PCRA petition. On December 31, 2015, Appellant's current counsel filed an amended PCRA petition, asserting that Appellant's prior counsel on direct appeal "was ineffective for withdrawing [Appellant's] appeal without his

---

[1] 35 P.S. § 780-113(a)(30).

[2] On March 13, 2013, before Appellant's appeal was discontinued, this Court submitted an Opinion pursuant to Pa. R.A.P. No. 1925(a).

1

express consent." Appellant therefore requested reinstatement "of his right to file a direct appeal nunc pro tunc."[3]

On May 11, 2016, without objection from the Commonwealth, this Court granted Appellant's request to reinstate his direct appeal rights nunc pro tunc. On May 19, 2016, Appellant filed a notice of appeal to the Superior Court, and on June 15, 2016, Appellant filed a Statement of Matters Complained of on Appeal.

## FACTUAL HISTORY

This Court summarized the facts of this case in its Opinion filed on March 13, 2013, which stated:

At trial, the Commonwealth first presented the testimony of Philadelphia Police Officer Brian Myers. Officer Myers testified that, on March 30, 2011, at approximately 5:40 p.m., he was on duty with the Narcotics Field Unit, which is responsible for investigating illegal sales of narcotics. On this particular date, he and his surveillance team were on assignment in the target area of North 5th Street and Hunting Park Avenue, specifically to investigate street sales of narcotics. From a discreet position at the northeast corner of the above intersection, Officer Myers observed a Hispanic male wearing a green jacket and blue jeans standing on the corner and looking in all directions. A few moments later, Appellant, who was wearing a red hat and brown jacket, emerged from a corner store located one half-block away on the southeast corner of Fairhill Street and Hunting Park Avenue. Appellant walked eastbound to 5th Street, where he met up with the other male and engaged in a brief conversation. Appellant then walked back to the corner store on Fairhill Street with his right hand in his jacket pocket the entire time. At that point, Officer Myers radioed a description of Appellant to his backup officers and instructed them to stop Appellant for investigation. (See N.T. 06/12/12, pp. 14-20).

Philadelphia Police Sergeant Robert Friel testified next for the Commonwealth. Sergeant Friel testified that, on March 30, 2011, he was on duty with the Narcotics Field Unit, serving as a back-up officer to Officer Myers. Sergeant Friel observed Appellant walking westbound on Hunting Park Avenue, between 5th and Fairhill Streets, before he entered a store on the corner of Fairhill Street and Hunting Park Avenue. Upon receiving

---

[3] Appellant alleged he was "dissatisfied with the representation he had received from the Defender Association," which represented him at trial, in his first PCRA petition, and during his first direct appeal that was "discontinued." Appellant claimed that although he asked the Defender Association "to withdraw from the case," he never requested his counsel to withdraw or discontinue his direct appeal. Appellant claimed that because "he did not speak English, and required assistance of other inmates, he did not realize that by the Defender Association withdrawing from the case, his appeal would be discontinued."

2

information from Officer Myers, Sergeant Friel and his partner, Officer Coolen, entered the corner store, where they encountered Appellant sitting at a table toward the back of the store. Sergeant Friel and Officer Coolen approached Appellant and announced "Police", at which time Sergeant Friel observed Appellant retrieve a clear plastic bag from his right jacket pocket, and discard it onto the floor beneath the table. As Officer Coolen tried to get Appellant to stand up, Sergeant Friel immediately went under the table and retrieved the bag. He testified that, "At that point, [Appellant] started to fight us." Upon detaining Appellant in handcuffs, Sergeant Friel placed the bag, which contained a tan substance suspected to be heroin, under property receipt, and submitted it to the chemistry lab for further analysis. (See N.T. 06/12/12, pp. 36-47).

The Commonwealth also presented the testimony of Philadelphia Police Officer Antonio Morrone, who testified as an expert in the field of packaging and distribution of narcotics. Officer Morrone testified that he examined the heroin recovered by police, and that based on its size (173 grams) -- in addition to its purer color (tan) and consistency (grounded and moist) -- the heroin was possessed with an intent to deliver. Officer Morrone explained that, beside never personally encountering a single, personal purchase of this size, a user never would purchase 173 grams of heroin because it would be too expensive (it would cost between $8,500 and $13,000) and lose its purity over time (more rapidly depending on exposure to light and air). He further explained that a heavy user ingests 100 to 130 milligrams per day, and therefore the 173 grams of heroin recovered in this case would last a user 12 to 17 months. Moreover, in his experience, users typically purchase only a couple small packets at a time, not 737 grams. In fact, the only people he had encountered with such an amount were at a higher level in the drug distribution chain -- i.e., "not a regular street dealer, it would be somebody in the higher chain of the distribution of heroin." (See N.T. 06/12/13, pp. 4-20).

Upon consideration of the above evidence, the jury found Appellant guilty of PWID. Appellant waived his presentence investigation, and this Court imposed sentence as previously set forth.

---

[2] Both Sergeant Friel and Officer Coolen were in plain clothes, with their police badges exposed. (See N.T. 06/12/12, pp. 37-38, 49-50).

[3] The Commonwealth introduced via stipulation chemical analysis evidence establishing that the item recovered by police -- one clear bag containing a tan powder -- tested positive for heroin and weighed 173.7 grams. (See N.T. 06/12/13, p. 24).

[4] At the time of trial, Officer Morrone had spent 28 years with the Philadelphia Police Department, 25 of which were in the Narcotics Field Unit. In addition to undergoing narcotics training with the New York, New Jersey and Pennsylvania state police, he spent five years working, and undergoing extensive narcotics training, with the Federal Drug Enforcement Agency (DEA), including training on the manufacturing of narcotics from plant source to final packaged product. Over the course of his career, Officer Morrone personally had participated in more than 800 drug arrests. (See N.T. 06/12/13, pp. 4-15).

3

[5] Given that this was Appellant's second conviction for PWID, and based on the quantity of heroin (more than 50 grams), this Court was obligated to impose a minimum sentence of seven (7) to fourteen (14) years' incarceration. (See N.T. 06/12/13, p. 53).

## ISSUES RAISED ON APPEAL

Appellant raises the following issues in his Rule 1925(b) Statement:

"1. The evidence was insufficient for the following reasons:

a. Police Officer, Antonio Morrone, who was certified as an expert in the field of packaging and distribution of narcotics, estimated that the 173.7 grams of heroin seized in this case would be a 12 to 17 month supply for a heavy drug user. After establishing that a heavy drug user would not purchase a 12 to 17 month supply for his own use because it has limited shelf life, Ofc. Morrone stated verbatim: 'A user probably would [overdose] himself having this much.' Trial counsel's objection predicated on mere speculation was sustained and the jury was specifically instructed to disregard the statement: 'A drug user probably would [overdose] himself having this much.' Ofc. Morrone was also instructed to direct himself to the question asked, (N.T. 6/13/12 at 13), and after asking that the question be restated, the prosecutor proceeded by asking would a heavy user purchase 173.7 grams of heroin. Ofc. Morrone stated: 'No they would not.' When asked why not, Ofc. Morrone exceeded the scope of his expert qualifications by stating:
*'It's my <u>personal opinion</u>, I have never seen one purchase this large amount, because mostly users that I know, and I have spoken to several thousands of them, and distributors and dealers, would not have this amount. They would just buy [a] couple of bags, a bundle per day. Having this much finger tips, my <u>personal opinion</u>, they would abuse it.'* (N.T. 6/13/12 at 14) (Emphasis Added). This testimony clearly had a substantial and injurious effect on the verdict in that, despite being instructed to disregard that a user 'probably' would overdose, the jury was improperly permitted to consider Ofc. Morrone's personal opinion.

b. There was no actual delivery or transfer of the drugs in question.

c. The Commonwealth did not introduce any evidence to the jury that heroin is a controlled substance in Pennsylvania. Trial counsel stipulated that, 'if called to testify, Stephanie Muehler, who words for the Philadelphia police chemistry lab, would testify that she tested the items placed into Property Receipt No. 2965912. And that item was one clear plastic bag, doubled over, containing a tan powder, which it did measure at 173.7 grams. And upon chemical test, it came back positive for heroin.' (N.T. 6/13/12 at 24). A review of the trial court record, however, reveals that the Commonwealth did not introduce any evidence whatsoever at trial which proves beyond a reasonable doubt, that heroin is, in fact, a controlled substance in Pennsylvania. Rather, the Court stated to the jury: 'I

4

hereby charge you that heroin is, in fact, a controlled substance in Pennsylvania.' (N.T. 6/1312 at 42). Therefore, the judgment of conviction in this case relative to the element of heroin being a controlled substance in Pennsylvania, is not established upon facts, determined by a jury beyond a reasonable doubt, based on evidence admitted at trial.

d. The evidence was contradictory and unreliable as to whether the defendant possessed the drugs in question.

2. There was prosecutorial misconduct by the prosecutor in closing statements. The Prosecutor said that 'should we have turned him, should we have gone up the chain, try to figure out who this next connection was? Maybe. There is only one person in the room who knows whose[sic] Mr. Medina's next connection was, that's Mr. Medina. (NT 6/13/12 @ 20)

The judge overruled the objection and permitted it. This statement influenced the jury to see the defendant as not testifying. The defense attorney (NT 6/13/12 @ 48) made this clear that she did not want it made known to the jury that he wasn't going to testify."

## DISCUSSION

This Court will address Appellant's claims in the order that he raises them in his Rule 1925(b) Statement.

**1(a). Whether Officer Morrone's purported "personal opinions" require overturning Appellant's verdicts.**

Appellant claims that Officer Morrone's following testimony was "improperly permitted" and "clearly had a substantial and injurious effect on the verdict":

Q.     "Would a heavy user purchase a 12 to 17 months of heroin?"

Officer Morrone.     "No. They would not."

Q.     "Why not?"

Officer Morrone.     "It's my personal opinion, I have never seen one purchase this large amount, because mostly users that I know, and I have spoken to several thousands of them, and distributors and dealers, would not have this amount. They would just by couple of bags, a bundle, do bundle per day. Having this much finger tips, my personal opinion, they would abuse it."

5

(N.T., 6/13/12, pgs. 13-14).

Appellant claims the jury was "improperly permitted to consider Ofc. Morrone's personal opinion" when this Court sustained Appellant's earlier objection to the officer's testimony that Appellant "probably" would overdose if he attempted to use all 173 grams of heroin before it lost its strength. Even assuming that Appellant has not waived this challenge, it is completely meritless.[4]

Officer Morrone has worked in the Narcotics Field Unit for 25 years and received narcotics training from the Drug Enforcement Administration (DEA), the New Jersey State Police, the Pennsylvania State Police, and the New York State Police. He testified as an expert in the packaging and distribution of narcotics in the City of Philadelphia, and his expertise on these issues was unchallenged by Appellant. (N.T., 6/13/12, pgs. 5-8). Officer Morrone's **expert opinion**, based on his 25 years of training and experience, is exactly the same as what he characterized as his "personal opinion." After listening to the testimony of Officers Myers and Friel, and after examining the 173 grams of heroin that Appellant discarded seconds before his arrest, Officer Morrone opined **in his expert capacity** that the heroin was possessed for purposes

_____

[4] Appellant never objected to the testimony he challenges on appeal. He rather objected to Officer Morrone's testimony that someone "probably" would overdose if he used 173 grams of heroin before it lost its strength (*i.e.*, its "shelf life"). Appellant apparently believes that his earlier objection applied equally to Officer Morrone's subsequent "personal opinion." This Court disagrees and concludes that Appellant's appeal on this ground has been waived. See e.g., Commonwealth v. Parker, 104 A.3d 17, 28 (Pa. Super. 2014) ("Error may not be predicated upon a ruling that admits evidence unless a timely objection, motion to strike, or motion *in limine* appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."); Commonwealth v. Baumhammers, 599 Pa. 1, 23 (2008) ("[I]t is axiomatic that issues are preserved when objections are made timely to the error or offense," and that "an absence of contemporaneous objections renders an appellant's claims waived."); Commonwealth v. Montalvo, 641 A.2d 1176, 1184 (Pa. Super. 1994) ("[A] party must make a timely and specific objection.... The Superior Court will not consider a claim on appeal which was not called to the trial court's attention at a time when any error committed could have been corrected.").

of "distribution." Officer Morrone at length explained, without objection, that the size, condition, and packaging of the heroin all supported his opinion:

Q.      "So, if I understand you correctly, this heroin is in powder form after the finger form?"

Officer Morrone.      "Correct."

Q.      "Now, obviously it's in one big bag; is that right?"

Officer Morrone.      "Yes."

Q.      "What, if anything, does that tell you based upon your training and experience about that heroin?"

Officer Morrone.      "Whoever possessed this large amount of heroin has it for distribution only, not for personal use."

Q.      "How do you know that?"

Officer Morrone.      "A user would never purchase 173 grams. You look at an approximate value from, I would say, 8,500 to $13,000. And from this small packet alone, you can do it two different ways. In Philadelphia right now a packet of heroin ranges between 15 milligrams to 30 milligrams per packet."

Q.      "So how many packets or how many 30 milligram packets would you get out of this bag?"

Officer Morrone.      "About 5,700 packets."

The Court.      "How many did you say?"

Officer Morrone.      "5,700 or a value of $57,000, Your Honor."

...

Q.      "So, if I understand you correctly, those packets sell for $10 a piece?"

Officer Morrone.      "That's correct."

Q.      "Now, if someone was a heavy user of heroin, would they still not buy a bulk amount?"

Officer Morrone.      "No. They would not."

7

Q.      "Why not?"

Officer Morrone.        "In 25 years I have never seen a user purchase this type of heroin in one bulk form."

Q.      "Why not?"

Officer Morrone.        "First of all, the life shelf of this and the usage, the heaviest user I have seen, got approximately a bundle or two bundles per day."

Q.      "Tell us about a bundle."

Officer Morrone.        "A bundle consists of approximately 11 to 13, to 14 packets per bundle. Right now some of the bundles are coming in 15 milligrams, which are really light. A heavy user would take, instead of one bag, would get two or three bags put together and ingest it, inject it or smoke it.... A heavy user would need a 100 to 130 milligrams per day to be able to function."

Q.      "So for a heavy user, 130 milligrams per day, how many days would that packet last?"

Officer Morrone.        "I would estimate, probably, I would say between 12 to 17 months."

Q.      "And if a heavy user were to buy or to save up the money to buy heroin, why wouldn't they buy 12 to 17 months in advance?"

Officer Morrone.        "Like I stated before, the life expectancy of this drug depends where it's kept, how it's kept...."

...

Q.      "Would a heavy user purchase a 12 to 17 months of heroin?"

Officer Morrone.        "No. They would not."

...

Q.      "After having listened to the testimony in this case and having reviewed the seizure analysis and the property receipt, have you come to an opinion based upon your training and experience as to whether the heroin involved in this case was possessed with the intent to deliver?"

Defense Counsel.        "No objection."

8

Officer Morrone.       "Yes. The person that had this amount would have had it for intent to distribute and not for personal use."

(N.T., 6/13/12, pgs. 11-18).

"The admission of evidence is a matter committed to the sound discretion of the trial court, and the court's evidentiary decisions will not be overturned absent an abuse of discretion." Commonwealth v. Edwards, 588 Pa. 151, 181 (Pa. 2006) (citations omitted here). Furthermore, the Superior Court is "not required to grant relief when an erroneous evidentiary ruling is harmless." Commonwealth v. Housman, 604 Pa. 596, 618 fn. 7 (Pa. 2009). "An error is harmless when: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." Id.

Officer Morrone's unchallenged and properly admitted "expert" opinions are indistinguishable from what he characterized as his "personal opinions." In his capacity as expert, Officer Morrone testified that he examined the heroin recovered by police, and that based on its size (173 grams) -- in addition to its purer color (tan) and consistency (grounded and moist) -- the heroin was possessed with an intent to deliver. Officer Morrone explained that, beside never personally encountering a single, personal purchase of this size, a user never would purchase 173 grams of heroin because it would be too expensive (it would cost between $8,500 and $13,000) and lose its purity over time (more rapidly depending on exposure to light and air). Officer Morrone further indicated that heroin purchased for personal use would come in smaller packaging than the single large bag recovered in this case. (N.T., 6/13/12, pgs. 11-18).

9

Similarly, Officer Morrone's "personal opinion" was that based on his years of experience investigating the packaging and distribution of narcotics, the large amount of heroin recovered in this case was possessed with the intent to distribute. What Officer Morrone characterized as his "personal opinion" was merely cumulative of his unchallenged and properly admitted expert opinions, and Appellant's appeal on this ground is frivolous.

**1(b).    Whether there was sufficient evidence to sustain Appellant's conviction when "[t]here was no actual delivery or transfer of the drugs in question."**

"When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt." Commonwealth v. Ratsamy, 594 Pa. 176, 183 (Pa. 2007) (citations omitted here). "It [is] incumbent upon the Superior Court to consider all of the evidence introduced at the time of trial, and apparently believed by the fact finder, including the expert's testimony." Id. "In applying this standard, the reviewing court must bear in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire record should be evaluated and all evidence received considered, whether or not the trial court's ruling thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence." Id. "The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Id. at 180. "Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict." Id.

10

"In order to uphold a conviction for possession of narcotics with the intent to deliver, the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a controlled substance and did so with the intent to deliver it." Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa. Super. 2000). "The intent to deliver may be inferred from an examination of the facts and circumstances surrounding the case." Id. "Factors which may be relevant in establishing that drugs were possessed with the intent to deliver include the particular method of packaging, the form of the drug, and the behavior of the defendant." Id.; Commonwealth v. Jones, 874 A.2d 108 (Pa. Super. 2004). "Possession with intent to deliver can be inferred from the quantity of the drugs possessed and other surrounding circumstances, such as lack of paraphernalia for consumption." Ratsamy, 594 Pa. 176, 183-184 (citations omitted here).

"The final factor to be considered is expert testimony." Ratsamy, 594 Pa. 176, 182 (citations omitted here). "Expert opinion testimony is admissible concerning whether the facts surrounding the possession of controlled substances are consistent with an intent to deliver rather than with an intent to possess it for personal use." Id. "[E]xpert testimony is important in drug cases where the other evidence may not conclusively establish that the drugs were intended for distribution." Id.

Officer Friel testified that he and his partner entered a store pursuant to information received from Officer Myers. Near the back of the store, the officers encountered Appellant seated at a table. When the officers announced "Police," Appellant retrieved a clear plastic bag from his right jacket pocket and discarded it onto the floor beneath the table. Chemical testing established that the plastic bag contained 173.7 grams of heroin. Officer Morrone testified that he examined the heroin and that based on its packaging, size, and condition, the heroin was possessed with an intent to deliver. (N.T., 6/13/12, pgs. 11-18). This evidence – regarding

11

Appellant's arrest as well as the quantity, condition, and packaging of the heroin he discarded – amply sustains the jury's verdict, and Appellant's appeal on this ground is meritless.

**1(c).   Whether "the judgment of conviction in this case relative to the element of heroin being a controlled substance in Pennsylvania ... [was] established upon facts, determined by a jury beyond a reasonable doubt, based on evidence admitted at trial."**

Appellant claims the evidence does not sustain the verdict because:

[T]he Commonwealth did not introduce any evidence whatsoever at trial which proves beyond a reasonable doubt, that heroin is, in fact, a controlled substance in Pennsylvania. Rather, the Court stated to the jury: 'I hereby charge you that heroin is, in fact, a controlled substance in Pennsylvania.'

Appellant's claim is frivolous.  Appellant stipulated at trial that:

[I]f called to testify, Stephanie Muehler, who works for the Philadelphia police chemistry lab, would testify that she tested the item[] placed onto Property Receipt ... [a]nd that that item was one clear plastic bag, doubled over, containing a tan powder, that it did measure at 173.7 grams ... [a]nd upon chemical test, it came back positive for heroin.

(N.T., 6/13/12, pg. 24).  It is not a disputable issue of fact whether the Pennsylvania legislature designated heroin a "controlled substance." It is an indisputable **matter of law** that the legislature designated heroin a "controlled substance." See 35 P.S. § 780-104(1)(ii)(10).  No fact-finding was required on this purely legal issue and Appellant's misguided challenge is frivolous.

**1(d).   Whether "[t]he evidence was contradictory and unreliable as to whether [Appellant] possessed the drugs in question."**

Officer Friel testified that he and his partner entered a store and encountered Appellant seated at a table.  When the officers announced "Police," Appellant retrieved a clear plastic bag from his right jacket pocket and discarded it onto the floor beneath the table.  Chemical testing established that the plastic bag contained 173.7 grams of heroin.  Appellant produced no

12

witnesses to rebut Officer Friel's testimony, and he stipulated to the Commonwealth's evidence that the plastic bag recovered by Officer Friel contained 173.7 grams of heroin. Accordingly, the Commonwealth's evidence was neither "contradictory" nor "unreliable," and it entirely sustained the jury's verdict.

2.      **Whether "[t]here was prosecutorial misconduct by the prosecutor in closing statements."**

The prosecutor's remarks that Appellant challenges on appeal comprised:

MS. HOLLAND:      . . . We are here to search for the truth. And there's one truth in this case and it's a very simple truth, it's a very obvious truth that can't be run from. Mr. Medina can't run from the fact that he had this bag. Should we have turned him, should we have gone up the chain, try to figure out who this next connection was? Maybe. There is only one person in the room who knows whose [*sic*] Mr. Medina's next connection was, that's Mr. Medina.

MS. ZECCARDI:     Objection.

THE COURT:        Overruled.

MS. HOLLAND:      That's Mr. Medina who knows that. And you want to hold it against these officers because instead of getting the guy at the very top, they got somebody somewhere below? He's holding the bag and it really comes down to that. It's as simple as that.

(N.T. 06/13/12, pp. 19-20).

Appellant claims this Court improperly permitted the prosecutor's remarks because they "influenced the jury to see [Appellant] as not testifying." "[T]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make an objection and move for a mistrial." Commonwealth v. Sasse, 921 A.2d 1229, 1238 (Pa. Super. 2007) (citing Commonwealth v. Jones, 501 Pa. 162 (1983)). Although Appellant lodged an objection during the

13

Commonwealth's closing argument, he failed to contemporaneously move for a mistrial and his appeal on this ground is therefore waived.[5]

Even if Appellant did not waive his claim, it is meritless. "[R]eview of prosecutorial remarks and an allegation of prosecutorial misconduct requires [the court] to evaluate whether a defendant received a fair trial, not a perfect trial." Judy, 978 A.2d 1015, 1019 (citations omitted here). "[N]ot every intemperate or improper remark mandates the granting of a new trial; reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." Commonwealth v. Koehler, 614 Pa. 159, 198 (Pa. 2012); Commonwealth v. Van Horn, 797 A.2d 983, 989 (Pa. Super. 2002) (quoting Commonwealth v. Lilliok, 740 A.2d 237, 247 (Pa. Super. 1999)).

Viewing the prosecutor's comments as a whole and in context, it is plain that Appellant's vague assertion of misconduct is without merit. Appellant bases his claim on a narrow slice of the prosecutor's closing argument, without reference to the critical context in which the comment was made, to wit, in response to defense counsel's repeated attempts, on cross-examination and during closing argument, to fault police for interviewing three people at the scene, but letting them go, and for not "turning [Appellant] into a CI" in order to go "up the food chain" (suggesting that police could have done so, but simply were lazy). (See N.T. 06/12/12, pp. 20-26, 48; 06/13/12, pp. 19-21; 06//13/12 (closing arguments), p. 5-8, 11).[6]

---

[5] "The remedy of a mistrial is an extreme remedy required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal." Commonwealth v. Judy, 978 A.2d 1015, 1019 (Pa. Super. 2009).

[6] Appellant implied that if he were a "mule" for purposes of drug distribution, the police would have used him as a confidential informant to obtain evidence against senior players in the distribution scheme. For instance, in closing argument, Appellant's counsel in part argued:

14

"A prosecutor is permitted fairly wide latitude in advocating for the Commonwealth, including the right to argue all fair deductions from the evidence, to respond to defense arguments, and to engage in a certain degree of oratorical flair." Van Horn, 797 A.2d 983, 989. "A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments." Commonwealth v. Burno, 626 Pa. 30, 60 (Pa. 2014) (citations omitted here). "While it is improper for a prosecutor to offer any personal opinion as to the guilt of the defendant or the credibility of the witnesses, it is entirely proper for the prosecutor to summarize the evidence presented, to offer reasonable deductions and inferences from the evidence, and to argue that the evidence establishes the defendant's guilt." Id. (citations omitted here). "The prosecutor must be free to present his or her arguments with logical force and vigor, and comments representing mere oratorical flair are not objectionable." Id. "[A]ny allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel." Commonwealth v. Smith, 606 Pa. 127, 160 (Pa. 2010). "If a challenged remark is made in response to the defense's closing argument, it will generally be deemed fair response and hence permissible comment." Id.

Viewing the prosecutor's comments as a whole and in context, it is plain that Appellant's vague assertion of misconduct is without merit. Appellant bases his claim on a narrow slice of the prosecutor's closing argument, without reference to the critical context in which the comment

Officer Morrone testified about a lot of things. But mostly what really this comes down to, what Ms. Holland is going to argue, he testified that whoever possessed this, possessed it with intent to deliver. And he based that on the color, and he based it on the condition of it. But Sergeant Morrone also is the one that testified regarding, yes, you would try to turn the mule into a CI. You would talk to the CI. Is it reasonable, given what wasn't done in this case, given which statements were not taken down, who do we know they talked to? We know they talked to the guy on the street, we know they talked to the female, and we know they talked to the guy in the back. Three people that they spoke to and three people the they let go and three people that we don't have any names, addresses or statements from.... (N.T., 6/13/12, pgs. 10-11).

15

was made, to wit, in response to defense counsel's repeated attempts, on cross-examination and during closing argument, to fault police for interviewing three people at the scene, but letting them go, and for not "turning [Appellant] into a CI" in order to go "up the food chain" (suggesting that police could have done so, but simply were lazy). (See N.T. 06/12/12, pp. 20-26, 48; 06/13/12, pp. 19-21; 06//13/12 (closing arguments), p. 5-8, 11).[7]

Moreover, the prosecutor's fleeting reference, vis-à-vis the overwhelming, red-handed evidence of Appellant's guilt, hardly had the "unavoidable effect" of "prejudic[ing] the jury and form[ing] in their minds a fixed bias and hostility toward [Appellant] such that the jurors could not weigh the evidence and render a true verdict." Quoting Koehler, supra. Rather, the jury clearly rendered its verdict based on the abundant evidence of Appellant's guilt, and Appellant's appeal on this ground is baseless.

## CONCLUSION

For the reasons set forth in the foregoing Opinion, this Court's judgment of conviction and sentence should be affirmed.

---

[7] Appellant implied that if he were a "mule" for purposes of drug distribution, the police would have used him as a confidential informant to obtain evidence against senior players in the distribution scheme. For instance, in closing argument, Appellant's counsel in part argued:

Officer Morrone testified about a lot of things. But mostly what really this comes down to, what Ms. Holland is going to argue, he testified that whoever possessed this, possessed it with intent to deliver. And he based that on the color, and he based it on the condition of it. But Sergeant Morrone also is the one that testified regarding, yes, you would try to turn the mule into a CI. You would talk to the CI. Is it reasonable, given what wasn't done in this case, given which statements were not taken down, who do we know they talked to? We know they talked to the guy on the street, we know they talked to the female, and we know they talked to the guy in the back. Three people that they spoke to and three people the they let go and three people that we don't have any names, addresses or statements from…. (N.T., 6/13/12, pgs. 10-11).

16